**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

MICHAEL TODD RYDER, ET AL

VERSUS

UNION PACIFIC RAILROAD COMPANY

CIVIL ACTION

15-431-SDD-EWD

**RULING**

Before the Court are two *Motions for Partial Summary Judgment*[1] filed by Defendant, Union Pacific Railroad Company ("UP"). Plaintiffs filed *Oppositions*[2], to which Defendant filed *Replies.*[3] Intervenors, Pipeline Construction & Maintenance, Inc., and Zurich North American Insurance Company, ("Intervenors"), also filed *Oppositions*[4] adopting the arguments made by Plaintiffs. For the following reasons, the Court finds that Defendant's motions should be granted.

**I.  FACTUAL BACKGROUND**

This lawsuit arises out of a train car collision that occurred on February 16, 2015 which resulted in three fatalities.[5] The collision occurred at United States DOT Grade Crossing No. 755983T in De Soto Parish, Louisiana, between a pickup truck driven by John Cameron Watson ("Watson") and a UP train.[6]

The crossing at issue intersected Private Drive, a private gravel driveway, leading to a pipeline jobsite.[7] To gain access to the job site, vehicles traveling on Louisiana

---

[1] Rec. Doc. Nos. 84 and 170.
[2] Rec. Doc. Nos. 187 and 179.
[3] Rec. Doc. Nos. 183 and 189.
[4] Rec. Doc. Nos. 175 and 188.
[5] Rec. Doc. No. 1, p. 5, ¶23; p. 6, ¶31.
[6] Rec. Doc. No. 1, p. 5, ¶24, 26, 30.
[7] Rec. Doc. No. 1, p. 5, ¶26.
40827

Highway 5 turn east onto Private Drive.[8] After turning onto Private Drive, there is approximately seventy (70) feet of gravel road on the western side of the railroad tracks and eighty-five (85) feet of gravel road on the eastern side of the tracks, leading to a locked gate providing access to the jobsite.[9] After crossing the tracks, vehicles would have to stop and unlock the gate manually before proceeding on to the jobsite.[10]

On the date of the accident, Watson and his two passengers, Michael Todd Ryder, II, and Herbert Paul Barras, III, were returning to the job site after lunch.[11] Watson was the last in line of four vehicles waiting for the gate to be manually unlocked to gain access to the job site.[12] Due to the preceding vehicles, Watson's vehicle did not fit in the eighty-five (85) feet of roadway between the crossing and the jobsite gate.[13] Instead of stopping within the seventy (70) feet of gravel drive available in advance of the crossing, Watson pulled behind the third vehicle in line at the gate, with his vehicle straddling the crossing.[14] At the same time, a UP train approached the crossing traveling in a southbound direction.[15] UP engineer, Kenneth Charles, sounded the locomotive horn while approaching the crossing to warn the vehicle on the tracks.[16] Watson failed to move his vehicle to a position of safety to avoid the collision. All three occupants of the vehicle were killed in the collision.[17]

Plaintiffs brought suit against various Defendants including UP, alleging *inter alia*,

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*, ¶ 24-25.
[12] *Id.*
[13] *Id.* at p. 6., ¶28.
[14] *Id.*
[15] *Id.*, ¶29.
[16] Rec. Doc. No. 170-2, p. 8.
[17] Rec. Doc. No. 1, p. 6, ¶31.
40827

that UP was negligent in failing to install lights and gates or other additional warning devices at the subject railroad crossing.[18] Additionally, Plaintiffs allege that UP failed to ensure the horn on the locomotive complied with Federal Law, failed to use an emergency horn sequence (which Plaintiffs contend is a series of short horn blasts), and failed to instruct its employees about the deficiencies in train mounted audile warning systems, and the safety issues caused by those problems.[19]

UP moves this Court to dismiss those claims pertaining to the installation of additional warning devices on the basis that Plaintiffs cannot establish either a duty or causation.[20] UP also moves to dismiss those claims pertaining to inadequate audible warning based on federal preemption.[21] In opposition, Plaintiffs argue that several conditions of the crossing made it unreasonably dangerous giving rise to an extra statutory duty on UP to provide additional warnings at the crossing.[22] As to the inadequate audible warning claim, Plaintiffs argue that UP's testing of the locomotive horn was not in compliance with federal regulations, and the engineer failed to use an emergency horn sequence.[23]

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[18] Rec. Doc. No. 1, pp. 6-16, ¶32-53.
[19] Rec. Doc. No. 1, p 7, ¶1.
[20] Rec. Doc. No. 84-1, p. 1.
[21] Rec. Doc. No. 170, p. 2, ¶3.
[22] Rec. Doc. No. 187, pp. 3-9.
[23] Rec. Doc. No. 179, pp. 2-10.
40827

of law."[24] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[25] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[26] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[27] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[28]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[29] All reasonable factual inferences are drawn in favor of the nonmoving party.[30] However, "[t]he court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[31] "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his

---

[24] Fed. R. Civ. P. 56(a).
[25] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).
[26] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp. 2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)).
[27] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[28] *Willis v. Roche Biomedical Labs, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little,* 37 F.3d at 1075).
[29] *Pylant v. Hartford Life and Accident Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[30] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[31] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
40827

allegations … to get to a jury without any "significant probative evidence tending to support the complaint."""[32]

## B. Duty of a Railroad to Install Warning Devices at Private Crossings

Plaintiffs have alleged several violations of Louisiana state law regarding the installation of additional warning devices at the subject crossing.[33] "As a general rule, under the *Erie* doctrine, when a plaintiff asserts a state law claim in the federal court, the [c]ourt looks to state law in determining the substantive law that governs the claims…"[34] In this case, Louisiana law applicable to warning devices at Railroad Grade Crossings can be found in La. R.S. 32:169, which provides that railroads must erect and maintain "Railroad Cross Buck" signs at all public railroad crossings.[35] The railroad also has the duty to maintain its right-of-way adjacent to the railroad tracks.[36] Specifically, Louisiana law requires the railroad to make sure that vegetation and other structures that may obstruct the view of motorists is cleared for a distance of fifty (50) feet in width and three hundred (300) feet in length of either side of the crossing.[37] Once a railroad has complied with its statutory obligations, a railroad may have additional duties to warn motorists to the presence of the crossing if it is shown that the crossing constitutes a "dangerous trap." The Louisiana First Circuit Court of Appeal discussed the "dangerous trap" doctrine in

---

[32] *Nat'l Ass'n of Gov't Emp.'s v. City Pub. Serv. Bd.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[33] Plaintiffs also allege UP violated 23 C.F.R. §646. 214(b)(3)(i). However, applicable case law provides that UP cannot, as a matter of law, fail to comply with 23 C.F.R. 646.214(b)(3). See *Henning v. Union Pac. R. R. Co.*, 530 F.3d 1206, 1215 (8th Cir. 2008). Thus, Plaintiffs claim that UP violated 23 C.F.R. 646.214(b)(3)(i) is DISMISSED as a matter of law.
[34] *Garza v. Scott & White Mem. Hosp.*, 234 F.R.D. 617, 621 (W.D. Tex. 2005) (citing *Hall v. GE Plastic Pac. PTE, Ltd.*, 327 F.3d 391, 394 (5th Cir.2003)).
[35] La. R.S. 32:169(A).
[36] *Rivere v. Union Pac. R.R. Co.,* 93-1132 (La. App. 1 Cir. 10/7/94), 647 So. 2d 1140, 1145, *writ denied*, 95-0292 (La. 3/24/95); 651 So. 2d 295.
[37] La. R.S. 48:386.1(A).
40827

*Rivere v. Union Pacific Railroad Co.* as follows:

> Any other duties of the railroad with regard to further safety devices rises in proportion to the increasing dangerousness of the crossing, as determined by an approaching vehicle's ability to see the oncoming train. This concept is referred to as the "dangerous trap" doctrine. A crossing is considered a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train. When a dangerous trap exists, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning or providing signaling devices, etc.[38]

Louisiana law also places an obligation on motorists to yield to approaching trains.[39] When approaching a railroad crossing, identified by a cross buck sign, a motorist must slow down to a reasonable speed considering the existing conditions or must stop if necessary "where the driver or operator has a clear view of any approaching train."[40]

The parties are in agreement that there is no statutory duty under Louisiana law for railroads to install lights and gates at private railroad crossings.[41] The parties also agree that the railroad crossing in question is a private crossing. It is also undisputed that the subject crossing was marked with a railroad cross buck and stop sign on the date of the accident. Plaintiffs provide undisputed summary judgment evidence that UP internally changed the categorization of the subject crossing as 'private with public characteristics' a few years prior to the accident.[42] The Court finds that it is clear from the evidence presented that, as to the advance warnings, UP complied with Louisiana law for public

---

[38] *Rivere,* 647 So. 2d at 1145; citing *Glisson v. Missouri Pac. R.R. Co.*, 158 So. 2d 875 (La. App. 3rd Cir.1963). See also *Davis v. Canadian Nat. Ry.*, 2013-2959 (La. 4/17/14); 137 So. 3d 11.
[39] La. R.S. 32:171(E).
[40] La. R.S. 32:175(A).
[41] Rec. Doc. No. 63, p. 1-2.
[42] Rec. Doc. No. 187-11; Rec. Doc. 187-12; Rec. Doc. 187-13.
40827

crossings, despite the crossing being private, by placing the appropriate cross buck sign in accordance with La. R.S. 32:169.[43]

The record indicates that there were no obstructions in either direction of the tracks.[44] Photographs of the crossing reveal a completely unobstructed view of the train as it approached the crossing.[46] Nicholas Courteaux ("Courteaux"), the driver of the truck directly in front of Watson, testified that Watson stopped behind Courteaux, who was stopped just East of the tracks, while waiting on the gate to the private property to be unlocked.[47] Darius Carroll ("Carroll"), the conductor of the UP locomotive, testified that when he could first see the vehicles, the last vehicle was close to the track but not on it.[48] After the engineer started blowing the horn, Carroll observed the truck pull all the way onto the tracks.[49] Plaintiffs' complaint provides that there was eighty five (85) feet of gravel road from the crossing to the locked fence and seventy (70) feet of gravel road on the approach between the highway and the crossing.[50] The evidence is clear that if Watson would have heeded the cross buck and stop sign on the East side of the crossing, he would have had a clear line of sight of the approaching locomotive. Additionally, there was nothing preventing him from backing up off of the tracks in order to avoid the collision. While the facts of this case present a tragic accident, there seems to be no explanation as to why Watson decided to stop his vehicle on the tracks while waiting for the gate to

---

[43] Rec. Doc. No. 84-1 p. 2; Rec. Doc. No. 84-2; Rec. Doc. No. 84-5 p. 8, 9.
[44] Rec. Doc. No. 84-5 p. 3, lines 1-3. Deposition testimony of Luke Hebert ("Hebert"), one of the contractors working at the site on the day of the accident.
[46] Rec. Doc. No. 84-1, p. 2. Hebert confirmed that the pictures of the crossing presented at his deposition reflected the state of the crossing on the date of the accident.
[47] Rec. Doc. No. 84-3, p. 7-10.
[48] Rec. Doc. No. 84-4, p. 2-3.
[49] *Id.*
[50] Rec. Doc. No. 1, p. 5, ¶26.
40827

be unlocked.

      Plaintiffs argue that the following alleged conditions, or combination of conditions, render the subject railroad crossing unreasonably dangerous: high speed trains; loud oil field equipment and commercial truck traffic; non-compliant vegetation and a bend in the track which prevents motorists from seeing oncoming trains; unguarded crossing; lack of crossing agreement for non-compliant vegetation and signage; and short storage due to adjacent highway and a gate which can cause oil field traffic to become backed up on the crossing.[51] In support of these arguments, Plaintiffs offer the affidavits of Alan J. Blackwell,[52] Joellen Gill,[53] and William R. Hughes.[54] The Rule 26 report[55] of Joellen Gill is attached to each affidavit.[56] Each affiant attests to the opinions and findings of the Gill report which opines that the crossing in question was unreasonably dangerous for those reasons listed above. Specifically, the report opines that five conditions of the crossing (unguarded crossing, high speed trains, short storage,[57] commercial truck traffic, and lack of crossing agreement) gave rise to a duty on UP to implement additional warning devices beyond those present on the date of the accident. Furthermore, Plaintiffs point to UP's

---

[51] Rec. Doc. No. 187, p. 3-4.
[52] Rec. Doc. No. 187-3.
[53] Rec. Doc. No. 187-4.
[54] Rec. Doc. No. 187-5.
[55] Rec. Doc. No. 187-3, p. 9-28.
[56] In its reply brief, UP objects to the affidavits of Alan Blackwell and William Hughes as experts because they did not submit individual expert reports before the expert report deadline of May 30, 2017. UP objects insofar as Blackwell and Hughes were not signatories to the Gill report and therefore are not in compliance with Fed. R. Civ. P. 26(a)(2)(B). UP also objects to the Report and Affidavit of Joellen Gill insofar as she lacks the qualification to give an opinion on the condition of the railroad crossing. However, UP has not filed a *Motion in Limine or Daubert* motion challenging same. Therefore, the Court will not exclude the affidavits or the report on this basis.
[57] The report categorizes "short storage" as the distance on both sides of the tracks of the gravel road leading from LA HWY 5 to the locked access gate. In other words, the 70 feet of road before the crossing and the 85 feet after the crossing when approaching the locked gate.
40827

knowledge of a collision in 2008[58] and a near miss in 2009[59] as additional factors requiring additional warning devices at the crossing. Finally, Plaintiffs suggest the type of additional advance warnings UP could have implemented such as a contract flagger or other low cost warning devices based on the use of the crossing. Even considering all of the conditions and all of the evidence submitted by Plaintiff as true, there is no summary judgment evidence to show that Watson had to place himself in a position of peril in order to see an oncoming train.

Plaintiffs suggest that this Court should apply a different theory which would impose a duty on railroads to provide additional warning devices other than when the crossing is considered a "dangerous trap." In support of this argument, Plaintiffs cite to the Louisiana Supreme Court case of *Duncan v. Kansas City Southern Railway*.[60] Plaintiffs assert that the *Duncan* court imposes a duty on railroads to provide additional warnings when the crossing presents a "unique and local safety hazard."[61] However, the language Plaintiffs cite to in *Duncan* was verbiage contained in an expert report.[62] The *Duncan* court merely stated that based on the expert testimony, "the jury could have reasonably concluded that [the railroad] had a duty to plaintiffs to protect against the unique hazard presented by the [crossing]."[63] Since the court did not explain what the unique hazard was or what the requisite duty required, this statement by the court is mere dictum and does not present an alternate theory of imposing any additional duty on a

---

[58] Rec. Doc. No. 187-9.
[59] Rec. Doc. No. 187-10.
[60] 773 So. 2d 670 (La. 2000).
[61] *Id.* at 677.
[62] *Id.*
[63] *Id.*
40827

railroad.[64] The *Duncan* court analyzed and ultimately found that the railroad had breached its duty to keep their right-of-way clear so that there were no sight deficiencies for drivers stopped at a stop sign.[65] Thus, the *Duncan* court applied the "dangerous trap" doctrine when it found the duty breached by the railroad required motorists to place themselves in a position of peril in order to see oncoming trains. The undisputed facts of this case show that the crossing in question was void of any sight deficiencies. As such, this Court declines Plaintiffs invitation to recognize an additional theory, namely "unique and local safety hazard," to impose extra statutory advance warning duties on the railroad. The Court will analyze whether UP had additional duties to warn based on the application of the "dangerous trap" doctrine.

Defendant cites numerous cases applying the "dangerous trap" doctrine that were decided in the railroad's favor. In *Holland v. Norton*,[66] the court granted summary judgment in favor of the railroad because evidence showed there were no obstructions and the motorist could have placed himself in a position where he could have clearly seen down the entire length of the track. In *Benavidez v. Kansas City Southern Railway*,[67] the court granted summary judgment in favor of the railroad, concluding that the public crossing was not a "dangerous trap" because the motorist had sufficient vision down the track a distance of a couple of car lengths.

---

[64] "A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it. A statement is not dictum if it is necessary to the result or constitutes an explanation of the governing rules of law." *U.S. v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014).
[65] 773 So. 2d at 677 (La. 2000).
[66] 70 F.Supp. 2d 666 (E.D. La. 1999).
[67] No. 3:11-CV-1263, 2012 WL 2499495 (W.D. La. June 27, 2012).
40827

In *Rivere v. Union Pacific Railroad*,[68] the court overturned the district court's finding of a percentage of fault on the railroad because the plaintiff did not have to place himself in a position of peril to view the tracks. Most recently, the Louisiana Supreme Court in *Davis v. Canadian National Railway*[69] upheld the trial court's decision in granting summary judgment in favor of a railroad when applying the "dangerous trap" doctrine. In *Davis,* the plaintiff's mother was killed by an oncoming train as she walked across a railroad crossing.[70] The court stated: "[t]he uncontested facts showed that she did not have to place herself in a position of peril in order to see the oncoming train and that she simply did not look in either direction before crossing the tracks."[71] The court concluded that the railroad was under no further duty to warn roadway users of the presence of the crossing other than that required by La. R.S. 32:169(A).[72] As illustrated by the cases cited above, the extra statutory duty on a railroad to provide additional warning above and beyond those mandated by La. R.S. 32:269 is determined under the "dangerous trap" doctrine.

The evidence presented shows that UP complied with its duty to maintain adequate sight distances and with La. R.S. 32:169. Watson was not required to place himself in a position of peril in order to have a view of the oncoming train. Therefore, the crossing did not constitute a "dangerous trap" and UP was under no further duty to install additional warning devices. UP's *Motion for Partial Summary Judgment*[73] on Plaintiffs

---

[68] 93-1132 (La. App. 1 Cir. 10/7/94), 647 So. 2d 1140, writ denied, 95-0292 (La. 3/24/95), 651 So. 2d 295.
[69] 2013-2959 (La. 4/17/14), 137 So. 3d 11.
[70] *Id.* at 12.
[71] *Id.* at 13.
[72] *Id.*
[73] Rec. Doc. No. 84-1, p. 4. (See specifically, those claims listed as d-k in UP's Motion).
40827

claims concerning additional warning devices is GRANTED.[74]

### C. Inadequate Audible Warning

Defendant's second *Motion for Partial Summary Judgment*[75] addresses those allegations involving the locomotive horn, use thereof, and the failure to instruct employees about the alleged deficiencies in locomotive audible warning systems. Specifically, Defendant asserts that it complied with the federal audibility requirements of 49 C.F.R. 229.129. UP also argues that federal law subsumes the issues of sounding the locomotive horn during emergencies and the instruction of its employees, thus preempting Plaintiffs claims on those issues.

Federal Preemption of railroad claims is set forth within the Federal Railroad Safety Act (FRSA).[76] The purpose of the FRSA is "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons...."[77] "[T]he Secretary [of Transportation] is given broad powers to 'prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety....'"[78] "Where a state statute conflicts with, or frustrates, federal law, the former must give way."[79] The pre-emption provision of 49 U.S.C. 20106 provides in pertinent part:

> (a) National uniformity of regulation.
>
> (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally

---

[74] Plaintiffs also argue that summary judgment is inappropriate because they have alleged UP is liable under La. C.C. art. 2317.1. However, UP did not move to dismiss those claims in either of its *Motions*. Therefore, those claims are not before this Court and are not discussed herein.
[75] Rec. Doc. No. 170.
[76] 49 U.S.C. 20101, *et seq*.
[77] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 661 (1993).
[78] *Id.* at 662.
[79] *Id.* at 663.
40827

uniform to the extent practicable.

(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order-

- (A) is necessary to eliminate or reduce an essentially local safety or security hazard;

- (B) is not incompatible with a law, regulation, or order of the United States Government; and

- (C) does not unreasonably burden interstate commerce.

(b) Clarification regarding State law causes of action.

(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

- (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

- (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

- (C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(b) Jurisdiction.--Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

In order for Plaintiffs claims to survive pre-emption, they must show that UP failed to comply with a Federal standard of care; failed to comply with its own plan, rule, or standard; or failed to comply with State law as set forth above.

Here, both parties concede that 49 C.F.R. 229.129 dictates the audibility requirements of locomotive horns. The sections applicable to the parties' contentions are those governing the audibility of the horn and the accompanying testing procedure. The Code of Federal Regulations requires the horn equipped on a locomotive to produce a sound within a minimum level of 96 dBA and a maximum of 110 dBA.[80] Additionally, the CFR provides regulations for the testing of the locomotive horn sound level.[81] Plaintiffs counter the defendant's preemption defense by contending that the railroad failed to comply with the federal regulations on horn audibility.[82] Specifically at issue are the following provisions of 49 C.F.R. 229.129(c):

> (8) Background noise shall be minimal: the sound level at the test site immediately before and after each horn sounding event shall be at least 10 dB(A) below the level measured during the horn sounding.
>
> (10) Written reports of locomotive horn testing required by this part shall be made and shall reflect horn type; the date, place, and manner of testing; and sound level measurements. These reports, which shall be signed by the person who performs the test, shall be retained by the railroad, at a location of its choice, until a subsequent locomotive horn test is completed and shall be made available, upon request, to FRA as provided by 49 U.S.C. 20107.

In support of its claimed compliance with the statute, Defendant submitted two tests of the locomotive horn, one dated May 20, 2010,[83] and one dated February 20,

---

[80] 49 C.F.R. 229.129(a).
[81] 49 C.F.R. 229.129(c).
[82] 29 U.S.C. 20106(b)(1)(A).
[83] Rec. Doc. No. 170-7.
40827

2015, both attested to by Jeff Brinkmeyer.[84] The first test shows the average horn sound level on the lead locomotive involved in the accident, as 101.2 dBA. The second test shows an average horn sound level of 98.7 dBA. Both tests showed horn sound level inside the requisite parameters set forth in 29 C.F.R. 229.129.

Plaintiffs argue that the evidence submitted by Defendant does not provide adequate proof of compliance with the regulations. In support of this contention, Plaintiffs submit the expert report of Michael F. Seidemann, Ph.D ("Seidemann").[85] In his report, Seidemann opines that the tests submitted by Defendant lack ambient noise measurements required by 49 C.F.R. 229.29 (sic) and thus call into question the validity of the tests.[86] Seidemann offers no other reason suggesting that the tests were invalid and, for purposes of his expert opinion, Seidemann accepted and utilized the results of the May 20, 2010 test.[87] Plaintiffs submit no further evidence in support of their contention.[88]

While the C.F.R. does not use the term "ambient noise," the Court assumes, for the sake of argument, that Dr. Seidemann was referring to section (c)(8) requiring background noise during the test to be "minimal."[89] The regulations do not require that background noise measurement be recorded in order for a report to be valid.[90] Moreover,

---

[84] Rec. Doc. No. 170-3.
[85] Plaintiffs cite to the Seidemann report as "Ex. A-2" to their Opposition. The Court notes that the only document attached as Ex. A to their Opposition is the executed Affidavit of Michael F. Seidemann. However, the Court received the report of Dr. Seidemann in its previous *Opposition* and referred to Rec. Doc. No. 187-22 for purposes of this Ruling.
[86] Rec. Doc. No. 187-22, p. 34.
[87] *Id.*
[88] Plaintiffs also submit evidence that truck drivers cannot hear locomotive horns at the crossing in question. However, none of this evidence bears any relevance on whether the Defendant complied with 49 C.F.R. 229.129.
[89] 49 C.F.R. 229.129(c)(8).
[90] 49 C.F.R. 229.129(c)(10).
40827

Seidemann offers no support for that conclusion. Such conclusory allegations, without more, do not create a material issue of fact on whether UP complied with federal regulations on locomotive horn audibility. Plaintiffs have not presented any evidence that UP failed to comply with the Federal standard of care established governing horn audibility. Thus, Defendant's *Motion* is GRANTED and Plaintiffs' claim alleging Defendant did not comply with 49 C.F.R. 229.129 is dismissed as a matter of law.

Next, Plaintiffs argue that Defendant failed to use an emergency horn sequence in accordance with the General Code of Operating Rules ("G.C.O.R.") 5.8.2.[91] The federal requirements for sounding a locomotive horn while at a private crossing are set forth in 49 C.F.R. 222.23(a) which provides in pertinent part:

> (a)(1) Notwithstanding any other provision of this part, a locomotive engineer may sound the locomotive horn to provide a warning to animals, vehicle operators, pedestrians, trespassers or crews on other trains in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate in order to prevent imminent injury, death, or property damage.
>
> (2) Notwithstanding any other provision of this part, including provisions addressing the establishment of a quiet zone, limits on the length of time in which a horn may be sounded, or installation of wayside horns within quiet zones, this part does not preclude the sounding of locomotive horns in emergency situations, nor does it impose a legal duty to sound the locomotive horn in such situations.

Thus, federal law places the discretion of how to sound the horn during an emergency situation with the engineer. Nevertheless, Plaintiffs argue that their claim is not preempted because Defendant failed to comply with its own plan, rule, or standard that it created on the use of the emergency horn sequence. Specifically, the Plaintiffs allege that the

---

[91] Thus avoiding preemption on their failure to use the proper emergency horn sequence claim. 29 U.S.C. 20106(b)(1)(B).

40827

Defendant violated the G.C.O.R. Rule 5.8.2[92] when the engineer blew a constant horn for the last couple of seconds before impact.[93] Defendant relies on several cases which address this very allegation.[94] Courts have continually found that, in light of 49 C.F.R. 222.23, claims that engineers failed to comply with G.C.O.R. 5.8.2 are preempted by federal law.[95] Here, just as in *Marsh v. Norfolk Southern, Inc.*, Plaintiffs do not cite to any federal regulation mandating the use of a succession of short sounds.[96] "Thus, federal law does not impose a legal duty on the engineer to sound the horn."[97] As such, this Court finds that Plaintiffs' claim that Defendant failed to use the appropriate emergency horn sequence is preempted as a matter of law.

Lastly, Plaintiffs claim that Defendant was negligent in failing to instruct its employees of the deficiencies in train mounted audible warning systems. However, Plaintiffs have failed to submit summary judgment evidence that any certifications, training, policies, procedures, and practices of UP employees violated any of the deferral standards set forth in 49 C.F.R. 240. Section 240 specifies standards for the "eligibility, training, testing, certification and monitoring of all locomotive engineers."[98] The regulations include a detailed scheme by which a railroad company must obtain Federal Railroad Administration ("FRA") approval of its engineer and conductor certification programs, including its criteria for continuing education, testing, training, and monitoring

---

[92] Rec. Doc. No. 174-6, p. 5.
[93] Rec. Doc. No. 174-7 at p. 6-9; Rec. Doc. No. 174-8.
[94] See *Rasmusen v. White*, 970 F. Supp. 2d. 807, 817-18 (N.D. Ill. 2013); *Marsh v. Norfolk S., Inc.*, No. 3:14-CV-02331, 2017 WL 1049084, at *13 (M.D. Pa. Mar. 20, 2017); *Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1157 (N.D. Cal. 2014).
[95] *Marsh*, 2017 WL 1049084, at *13.
[96] *Id.*
[97] *Id.*
[98] 49 C.F.R. 240.1(b).
40827

of performance.[99] "To prevail on the claim that [federal] regulations have pre-emptive effect, petitioner must establish more than that they 'touch upon' or 'relate to' that subject matter, ... pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law."[100] As such, other circuits have held that "federal training regulations do 'substantially subsume' the subject of employee training."[101]

Plaintiffs submit no evidence to suggest that Defendant has not complied with federal operating and training rules. Plaintiffs only submit the railroad crew's failure to sound the proper emergency horn sequence or apply the emergency brakes as evidence of deficient crew training.[102] As stated above, Plaintiffs' allegations that the Defendant failed to sound the proper emergency horn sequence are preempted as a matter of law. Further, as in *Marsh,* Plaintiffs have failed to point to any specific provision of federal regulations that were breached by the Defendant or show how UP's employee training policies are not in compliance.[103] Therefore, Plaintiffs have failed to submit summary judgment evidence to create a material issue of fact, and their claim against Defendant for alleged inadequate training of railroad employees is preempted as a matter of law. Summary Judgment is proper in favor of Defendant on all audible warning claims as stated in Defendant's *Motion*.

---

[99] 49 C.F.R. 240 and 49 C.F.R. 242.
[100] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).
[101] *Marsh,* 2017 WL 1049084, at *11, quoting *Union Pac. R. Co. v. California Pub. Utilities Comm'n,* 346 F.3d 851, 868 (9th Cir. 2003).
[102] Rec. Doc. No. 179 at p. 10.
[103] *Marsh*, 2017 WL 1049084, at *12.
40827

## III. CONCLUSION

For the reasons set forth above, Defendants' *Motion for Partial Summary Judgment on Plaintiffs' Lights and Gates Claims* (Rec. Doc. No. 84) and *Motion for Partial Summary Judgment on Plaintiffs' Inadequate Audible Warning Claims* (Rec. Doc. No. 170) are GRANTED.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on September 29, 2017.

*/s/ Shelly D. Dick*

**JUDGE SHELLY D. DICK
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**